PUBLISHED

COURT OF APPEALS OF VIRGINIA

Present: Judges Fulton, Ortiz and Raphael
Argued at Norfolk, Virginia

STAVROS P. GALIOTOS, INDIVIDUALLY AND
AS TRUSTEE OF THE ANTHONY S. GALIOTOS
TRUST AND TRUSTEE OF THE IRENE A.
GALIOTOS TRUST

v.      Record No. 0068-24-1

TASOS A. GALIOTOS, INDIVIDUALLY AS
BENEFICIARY UNDER THE WILL OF
IRENE A. GALIOTOS AND AS TRUSTEE
AND BENEFICIARY OF THE ANTHONY S.
GALIOTOS TRUST AND TRUSTEE OF THE
IRENE A. GALIOTOS TRUST, ET AL.

 

PAUL GALIOTOS, INDIVIDUALLY AND AS
TRUSTEE OF THE ANTHONY S. GALIOTOS
TRUST AND TRUSTEE OF THE IRENE A.
GALIOTOS TRUST

v.      Record No. 0077-24-1

TASOS A. GALIOTOS, INDIVIDUALLY AND AS
BENEFICIARY UNDER THE WILL OF
IRENE A. GALIOTOS AND AS TRUSTEE
AND BENEFICIARY OF THE ANTHONY S.
GALIOTOS TRUST AND TRUSTEE OF THE
IRENE A. GALIOTOS TRUST, ET AL.

OPINION BY
JUDGE STUART A. RAPHAEL
DECEMBER 30, 2024

FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
H. Vincent Conway, Jr., Judge Designate

Roman Lifson (David B. Lacy; Grayson B. Cassada; Stavros P.
Galiotos, *pro se*; Christian & Barton, L.L.P., on briefs), for appellant
Stavros P. Galiotos.

Richard H. Ottinger (Katherine M. Lennon; Woods Rogers
Vandeventer Black PLC, on briefs), for appellant Paul Galiotos,
individually and as trustee of the Anthony Galiotos Trust and as
trustee of the Irene Galiotos Trust.

Gary A. Bryant (Willcox & Savage, P.C., on brief), for appellee Tasos A. Galiotos, individually as beneficiary under the will of Irene A. Galiotos and as Trustee and Beneficiary of the Anthony Galiotos Trust and Trustee of the Irene Galiotos Trust.

No brief for Stephanie C. Smith, Administrator of the Estate of Irene A. Galiotos, deceased.

The central players in this appeal are three brothers who are the beneficiaries and co-trustees of two trusts, established by their now-deceased parents, holding millions of dollars in investment properties and other assets. For years, the brothers have been at loggerheads over how to distribute the trust assets. One brother insisted on a pro-rata distribution. The other two—as majority co-trustees—sought a non-pro-rata distribution that would help them part company with their dissenting brother. The majority co-trustees divided the assets into three buckets that they claimed were equal in value. But they foisted on the dissenting brother the bucket that he believed was least valuable, and they refused his request to trade.

After a three-day trial on the fairness of the majority trustees' non-pro-rata plan, the chancellor found that their valuations were not credible and that the plan was unfair to the dissenting brother. The chancellor also found that the parents—the settlors of the trusts— intended to distribute equal interests in each asset. So the chancellor ordered a pro-rata distribution. He also adjudicated the brothers' respective attorney-fee claims.

On appeal, the majority co-trustees argue that their non-pro-rata plan should have been approved. But the chancellor's unfairness finding is well supported by the record. And the majority co-trustees did not appeal the chancellor's ruling that a pro-rata distribution best effectuates the settlors' intent. We therefore affirm the chancellor's ruling, and we decline to disturb his resolution of the brothers' respective attorney-fee claims.

BACKGROUND

Because the chancellor decided this case after a hearing ore tenus, "[w]e must review all of the evidence presented to the court in the light most favorable to the prevailing party." *Rafalko v. Georgiadis*, 290 Va. 384, 398 (2015). We thus consider "the evidence and all reasonable inferences fairly deducible therefrom," *Hoffman Fam., LLC v. Mill Two Assocs.*, 259 Va. 685, 696 (2000), in the light most favorable to appellee Tasos Galiotos.

A. *Anthony and Irene Galiotos develop a real-estate empire that they intend to pass in trust in "equal shares" to their three sons.*

Anthony and Irene Galiotos were an American success story. Anthony was born in a small village in Greece. He later immigrated to the United States, married Irene, and settled in the Tidewater area. Anthony "pretty much always owned a restaurant." The couple also amassed sizable commercial-real-estate holdings throughout Norfolk and Virginia Beach.

Anthony and Irene's three sons—Stavros (Steve), Tasos, and Paul—grew up working at their parents' properties, doing things like cutting grass and sweeping the parking lots. Steve is the oldest son, Tasos is a year younger, and Paul is seven years younger than Steve.

Now middle-aged, all three brothers are highly experienced in matters involving real estate. Steve graduated from the Wharton School with a B.S. in economics and a concentration in management and real estate. He worked for several years with a large real-estate-investment firm in Chicago before transferring to a firm in New York that he described as "one of the largest real estate groups in the world." Steve later joined the real-estate group at a large, publicly traded hedge fund before forming his own real-estate-investment company. Paul has a master's degree in education and has taken various post-graduate business courses. Following a stint in the army, Paul "developed shopping centers [and] residential neighborhoods, [completed] buildouts of spaces, [and] bought and sold properties."

Tasos, a real-estate lawyer, earned his law degree in 1994 and has practiced law since then at several firms in the Tidewater area. Tasos began buying real estate for himself in the Hampton Roads area after graduating from law school. He provided free legal work for the family's companies and ultimately became the manager of various limited liability companies ("LLCs") that operated the family's real-estate investments.

During their lifetimes, Anthony and Irene conveyed real-estate interests to all three sons in "equal shares," except for once when Paul had to wait until he became an adult to receive his equal share. Sometimes, one son would ask for a greater share in an investment property based on the son's perceived greater contribution. But the parents never departed from their equal-share approach.

In 1982, Anthony established the Anthony S. Galiotos trust, establishing two trust shares—Trusts A and B—and naming Irene as trustee. Trust B was held for the primary benefit of Irene. The trust agreement provided that, upon Irene's death, "after the payment of, or the provision for payment of, all estate taxes imposed" on Irene's estate, the remaining principal would be "divided, per stirpes, into equal shares, one share for each child of" Anthony. The trust agreement empowered the trustee to "make distributions in cash or in kind . . . or partly in each, at valuations to be determined by the Trustee, whose decision as to values shall be conclusive." After Anthony died in 2006, Trust A was fully distributed, but Trust B was not.

In 2008, Irene established the Irene A. Galiotos Revocable Trust ("IAG Trust"). Similar to Anthony's trust agreement, the IAG Trust provided for the trust assets upon Irene's death to be "divided into equal shares, one share for each child." The agreement conferred on the trustee "all the powers set forth in Sections 55-548.6 and 64.1-57 of the Code of Virginia." Steve claims that this reference incorporated what is now Code § 64.2-105(B)(10), which permits a trust agreement to make the trustee's valuation decision on the distribution of assets "conclusive."

- 4 -

After Irene died in 2016, her estate owed more than $900,000 in estate taxes. Anthony's trust agreement required Trust B to pay the estate taxes, resulting in "an obligation [for Trust B] to reimburse Irene's estate" for those taxes. Irene's will "nominated and appointed Steve and Tasos to serve as co-executors of her estate." *Galiotos v. Galiotos*, 300 Va. 1, 5 (2021) ("*Galiotos I* ").

The three brothers jointly retained a trust-and-estates lawyer, Diane Thompson, to advise them on various issues surrounding Trust B and the IAG Trust. In February 2017, the brothers signed an "Agreement of Beneficiaries and Acceptance by Successor Co-Trustees." Recognizing that they were the joint beneficiaries of the trusts, the brothers appointed themselves as successor co-trustees of Trust B, empowered "to act by majority decision . . . except with respect to certain assets of Trust B." Each brother as trustee was entitled to vote one-third of the trustee votes for Argos Properties, LLC, Argos Properties II, LLC, and Columbus Square Associates (a general partnership). But unanimous agreement was required for decisions relating to Pinetree Square and three other properties on Military Highway, except for decisions about leases, repairs, and payment of real-estate taxes and ordinary business expenses.

Trust B and the IAG Trust continue to hold significant assets and interests in the companies that operated the family's various real-estate ventures. Those undistributed assets are the subject of this appeal.

B. *The brothers squabble about how to distribute the trust assets.*

As Tasos described it, the brothers never had a good relationship and were never close, even as children. This is not the first of their disputes to reach our appellate courts. After Steve and Tasos qualified as co-administrators of Irene's estate, they "had numerous disputes and misunderstandings," leading each to retain "separate legal counsel." *Galiotos I*, 300 Va. at 5. The brothers could not agree on "trivial matters," let alone "important" ones. *Id.* at 6. In the

litigation that followed, the circuit court found "that both Tasos and Steve frequently acted in their own best interest and that each brother's conduct, at times, led to frustration by the other in his efforts to administer the Estate." *Id.* at 8-9. Concluding that Tasos and Steve were "hopelessly deadlocked," the circuit court "appointed a disinterested third party, Stephanie Smith . . ., who is a Commissioner of Accounts, to serve as administrator of the Estate." *Id.* at 8-9. The Supreme Court affirmed that ruling. *Id.* at 11-12. The Court also affirmed the circuit court's decision denying Tasos and Steve reimbursement for the legal fees and expenses each incurred in that litigation. *Id.* at 11-13.

The brothers' quarrel over the assets in Trust B and the IAG Trust is at the heart of this appeal. Attorney Thompson advised the brothers in 2016 that, while a non-pro-rata distribution was legally permissible, the brothers should not attempt it unless they could all agree.[1] The conflicts among the brothers precipitated Thompson's withdrawal from representing them.

In April 2018, Tasos proposed that Steve and Paul divide the assets into three buckets and let Tasos choose first. Steve and Paul would then agree between themselves which of the remaining buckets to pick. But Steve and Paul would not accept that proposal. Steve testified that he believed it was most advantageous to pick first. Steve also worried that Tasos might identify an asset with greater value than Steve had estimated; if that happened, Steve would want to "redo the buckets."

In May 2020, with that impasse continuing, Steve and Paul voted to remove Tasos as the manager of various family companies. They also excluded him from discussions about new tenants, renewing leases, and repair work. Then they expelled him altogether as a member of

---

[1] The brothers waived the attorney-client privilege for Thompson to reveal her legal advice.

one family company (Aegean), claiming he was doing a bad job as manager and that they didn't want him to demand to see the rent rolls every week.

### C. Tasos and Steve seek aid and direction from the circuit court.

Following his ouster from management, Tasos sued Steve and Paul, seeking aid and direction from the court about the distribution of Irene's estate to the IAG Trust, the termination of both trusts, and the distribution of the trust assets to the beneficiaries. Smith was named as a defendant in her capacity as administrator of Irene's estate. Tasos also sought the removal of Steve and Paul as trustees and the return of the legal fees that they paid using trust funds. With leave of court, Tasos amended his complaint to seek dissolution of the various entities operating the family's real-estate investments.

Steve counterclaimed. He sought a declaratory judgment that the assets could be distributed from the trusts on a non-pro-rata basis. He also alleged that Tasos breached his fiduciary duties to his brothers by pursuing unfounded litigation and by acting inappropriately in the management of the properties. Steve sought to remove Tasos as a co-trustee.

The court permitted Tasos to file a second amended complaint—the operative one below—which ballooned into 12 counts. In Count 4, Tasos alleged that Steve and Paul breached their duty of loyalty to Tasos by appointing their own companies to serve as the managers of Arcadia II, Argos, and Argos II, and by excluding Tasos from the management of various LLCs. In Count 5, Tasos alleged that Steve and Paul breached their duty of impartiality in various ways (such as by entering into transactions in which they had a conflict of interest and by using "their positions as trustees to advantage themselves through a distribution scheme that gives each of them majority control over certain assets to the detriment of Tasos").

The trial judge, sitting as a chancellor in equity, established a timetable for Steve and Paul to set forth their plan for a non-pro-rata distribution of the trust assets. If the parties could

not agree on a plan, the chancellor scheduled a three-day trial to consider Steve and Paul's proposal. The chancellor announced that he might approve a non-pro-rata plan if it were fair, reasoning that a "[n]on pro rata division does not mean that the one-third shares are not equal. Within the human capacity to make things approximately equal, if the Court determines that the shares are approximately equal, then the Court will make a ruling [in] that regard." But if he found the plan to be unequal, the chancellor expected to order a "pro rata distribution." He warned the parties that the "estate must be concluded. It's gone on too long. It hasn't helped the harmony between the brothers at all." The chancellor also granted each brother $50,000 from the trusts to pay "for bona fide expenses relating to developing and evaluating any proposed distribution."

Steve proceeded to develop and propose a non-pro-rata-distribution plan. The initial plan was dated July 1, 2021. Paul did not help Steve come up with the proposal. But after reviewing it, Paul agreed that the plan was fair to all three brothers. Steve revised the plan on December 9, 2021, and again on February 3, 2022. Because Steve and Paul joined in sponsoring the plan, we refer to it as "Steve and Paul's plan."

For Trust B, their plan assigned Tasos 100% of the entity that owned Pinetree, which Steve valued at about $1.9 million. The plan also assigned Tasos 100% of Trust B's debt to the IAG Trust for paying the estate taxes on Irene's estate—$901,427.[2]

Steve and Paul assigned the other five income-generating entities to themselves, divided equally between them. Because the resulting shares to Steve and Paul, individually, would be less than 50% of each closely held company, they applied minority and marketability discounts. For the IAG Trust, they assigned the ownership interests in Arcadia and Arcadia II to be divided

---

[2] The plan called for the Estate to assign the note for the debt to the IAG Trust, where the note would be given to Tasos's children.

pro-rata among the children of Steve, Paul, and Tasos.  But Steve and Paul assigned on a non-pro-rata basis—to their own children—the ownership interests in Aegean, Argos, Argos II, Berkshire, Columbus, and Battlefield.  They made Tasos's children the beneficiaries of the $901,427 debt owed by Trust B to the IAG Trust.

Tasos offered to accept Steve and Paul's plan if he could switch buckets with either of them.  Steve and Paul declined.

Beginning on May 4, 2022, the chancellor conducted a three-day trial to consider Steve and Paul's plan.  The parties agreed at the start that their dispute over another property, Executive Cove, was not part of the hearing and not part of the plan.[3]

In Steve and Paul's case-in-chief, Steve testified about his method for dividing the assets into three buckets.  He drew up the initial allocation himself before asking his experts to review it.  Steve said that, having first assigned Pinetree to Tasos, and because Pinetree was so valuable, Steve had to assign 100% of the debt to Tasos and assign all the other income-producing properties to himself and Paul.  It was fair to give Tasos all the debt, Steve reasoned, because Tasos would simply owe that debt to his children.  Viewing Tasos and his children as one large family, Steve said, "[t]here is no debt.  [Tasos] owes it to himself."

As for the other five income-producing properties that Steve and Paul gave themselves, Steve explained why he discounted their value.  This was a "new concept" to him when he started.  He studied whether it was appropriate to use a "fair market value" methodology that would discount the assigned value of those interests due to a minority shareholder's lack of

---

[3] In *Galiotos I*, the Supreme Court declined to reach Steve's claim that Tasos improperly redeemed the estate's interest in Executive Cove, finding that issue unnecessary to resolve to affirm the trial court's ruling that Steve and Tasos should be removed as co-executors of Irene's estate.  *See* 300 Va. at 13-14, 16.  The Court noted the trial court's observation "that Smith could bring the issue before the court on behalf of the Estate in a future proceeding, if she deemed it appropriate and prudent to do so."  *Id.* at 14.

control in the company and the lack of marketability of shares that were not publicly traded. Steve understood, by contrast, that a "fair value" methodology would not apply such discounts. One consultant recommended that he "use fair market value." And he did.

So Steve discounted each of the LLC interests that he assigned to himself and Paul by amounts ranging from 36% to 53.8%. Those discounts reduced the stated value of the assets on Steve and Paul's side of the ledger by about $1.6 to $1.7 million.[4] Ostensibly to equalize the three shares, Steve and Paul assigned additional assets and cash to their buckets.

Steve described as an added benefit that his plan would put Paul and him on a path to separating their business interests from Tasos's, given their inability to get along. Steve insisted that his "primary objective . . . was to follow the trust documents and Virginia law . . . to create equal shares," thereby "adhering to [his] fiduciary obligations as a trustee." But his "second intent" was to separate from Tasos.

Steve was confronted on cross-examination with the fact that his plan did not entirely separate Steve and Paul's business interests from Tasos's. The plan distributed ownership shares in several business entities pro rata to Tasos's minor children. Steve responded, "I never said we had a complete separation, I said it puts us on a path over time to achieve a complete separation." He said that the separation could be complete if Tasos would give up his remaining interests in those companies in exchange for Steve and Paul's giving up their claim that Tasos improperly redeemed the interest of Irene's estate in Executive Cove. *See supra* note 3.

Steve and Paul called various expert witnesses in their case-in-chief to show that the three buckets of assets they created were roughly equal in value. Their principal expert, Harold G. Martin, Jr., a certified public accountant, reviewed the valuations of the business interests Steve

---

[4] As discussed at oral argument, it appears from Defense Exhibit 34 that Steve and Paul misapplied the minority and marketability discounts to several of the *cash* components that Steve and Paul assigned to themselves.

and Paul assigned to themselves. Martin agreed with Steve that it was appropriate to use a fair-market-value approach that included discounts for minority ownership and lack of marketability. Martin reasoned that the fair-market-value approach "is the most commonly recognized and used standard of value in judicial and legal proceedings." He acknowledged that a "fair value" approach without discounts is used in cases involving "dissenting shareholders" and "shareholder oppression," but he said this case did not involve those things. Martin concluded that the three buckets were of equal value.

Paul testified to his belief that Steve had divided the three buckets of assets in a manner that was "fair, impartial, and loyal." Paul admitted, however, that he had refused Tasos's request to trade buckets with him. Paul explained that he didn't want to "subject my brother Steve to having to be a partner with Tasos."

Steve and Paul presented no calculations to show whether a pro-rata-distribution plan would have resulted in shares with lower values than the non-pro-rata-distribution plan they advocated. Martin admitted that minority and marketability discounts would not have applied to a pro-rata-distribution plan in which each brother received equal shares in each asset. And while Steve claimed that a pro-rata distribution would have had adverse tax consequences and would have resulted in less value for each brother, Steve and Paul did not introduce their calculations or offer evidence to show that.

After Steve and Paul rested, Tasos explained why he believed that their plan was unfair. First, Steve and Paul's driving purpose was to separate their interests from his. Tasos did not think that a "fiduciary . . . should be using [his] trustee powers to impose a separation." And although the plan did not actually achieve such separation, it put Steve and Paul in a stronger litigating position for their remaining disputes. So Tasos viewed their plan as "trying to put me in a corner so they can shove me out."

Second, by assigning Pinetree to Tasos, Steve was "sticking" him with "the worst income-producing property." It was the least desirable and "worst" of the family-owned shopping centers. Steve knew that Tasos had a strong preference for income-producing properties, yet Steve gave Tasos only one of them. Steve and Paul then kept for themselves the remaining five income-producing properties, including Columbus, the best of all. To Tasos, it made "no sense" why Steve was trying to "stick it to me" with Pinetree "except for him being vindictive."

Third, Steve and Paul improperly discounted the values of the five income-producing properties they gave themselves, making those assets appear to be less valuable but increasing Steve and Paul's allotment by roughly $1.6 to 1.7 million. A fair-market-value approach using minority and marketability discounts was inappropriate, Tasos argued, because this was not a case involving a willing buyer and seller; Steve and Paul were trying to "force [their plan] down [his] throat." Instead, a fair-value approach without discounts was more appropriate because this situation was akin to an "equitable distribution" or "shareholder dissolution" case in which such discounts would not be applied. Tasos believed that Steve and Paul chose the fair-market-value approach with discounts "because that's what will give them the most."

Fourth, Tasos objected to being stuck with all the debt. He estimated that, between taxes and interest, it would cost him $1.5 million to discharge that debt. Alternatively, if Tasos had to sell land to pay off the debt, it would simply shift to him the obligation to pay capital-gains taxes that would have been borne by the estate if the estate had discharged the debt. Tasos asked, "[H]ow is it . . . fair in any way for Steve to shift a tax issue that belongs to all three of us to just me?" Tasos was also discomforted by Steve's assurance that Tasos could simply owe the debt to his children. Tasos worried about the risk of defaulting and the fact that the debt would still have to be discharged by his estate if Tasos died before paying it off.

Fifth, Tasos objected to the procedure his brothers were using to assign the three buckets. They rejected his proposal that Steve and Paul divide the assets into three buckets and let Tasos choose first. Instead, Steve and Paul had "picked the three buckets and . . . taken the first two picks." And when Tasos offered to accept Steve's proposed distribution plan if Tasos were allowed to trade buckets, Steve and Paul refused.

Finally, Tasos believed that a non-pro-rata distribution contradicted their parents' tradition and custom of giving "real estate interest[s] in equal shares." He added that, if the brothers had done a pro-rata distribution three years before, they would have saved more than a million dollars in litigation costs.

H. Gregory Waller, Ph.D., who qualified as an expert witness on business valuation, testified that Steve's plan was unfair to Tasos. Dr. Waller explained that no clear guidance exists for how to value minority shares in cases like this one. In his view, however, a fair-value approach without discounts would have been more appropriate than a fair-market-value approach that used discounts. Dr. Waller opined that the discounts taken by Steve and Paul gave them a "windfall." Their plan resulted in "an egregious under-allocation of assets to Tasos" compared to a "distribution without applying the discounts."

### D. *The chancellor rejects Steve and Paul's plan as unfair, orders a pro-rata distribution, and enters various fee-shifting orders.*

At the close of all evidence, the chancellor concluded that Steve and Paul's plan was unfair to Tasos. He ruled that Steve and Paul had the burden of persuasion to prove the fairness of the plan and its compliance with the estate documents and the trust. At the outset, the chancellor found it "clear . . . that the parents of these three sons had a history of distributing equal interest or shares in each particular asset." The "parents never gave one child or two children an interest and gave the other some money." He concluded that "the estate documents themselves continue their wishes in this regard by providing for equal share distribution."

- 13 -

Continuing, the chancellor found that Steve and Paul's asset valuations had "little credibility." He noted that Steve and Paul had turned down Tasos's offer to trade his asset bucket for one of theirs, suggesting that Steve and Paul knew that the bucket they assigned to Tasos was inferior.[5] It was also unfair to assign Tasos all the debt when the debt belonged jointly to all of three them. So the chancellor rejected the plan and ordered "that all assets in the trust[s] be distributed in equal shares pro rata."

The July 2022 order memorializing that ruling incorporated the reasons given from the bench and added several more findings. The chancellor's most "salient finding [wa]s that the plan proposed is unfair, unequal, and prompted by the self[-]interests of the Majority Trustees and fell far short of their responsibilities as trustees." The plan's unfairness was shown not only by Tasos's evidence but by Steve and Paul's own evidence. Steve and Paul's "evidence . . . on the value of the estate properties was inconsistent, challenged, unconvincing, and does not provide the confidence necessary to support a disproportionate division of the assets." The chancellor also found that Steve and Paul had elevated their desire to separate from Tasos above their own fiduciary obligations to treat him fairly:

> Based on the combative relationship existing between the parties, it is understandable that they may wish to separate their business associations in these properties in the future, absent a change in the relationships. But in attempting to do . . . at the trustee level what they wish to do at the beneficiary level, the Majority Trustees have not met the duty of loyalty, good faith and fairness required of trustees, each to the other, and to each of the beneficiaries.

The order directed that each brother receive a pro-rata interest in all property and that the Trust B debt be eliminated before distributing the assets. The order dismissed some of Tasos's other counts without prejudice. The chancellor also severed the remaining counts (including

---

[5] The chancellor also gave weight to the fact that Tasos had offered to buy one of the properties outright at a higher value than shown in Steve's plan, but instead of agreeing to that, Steve and Paul worried that they had not valued it highly enough.

- 14 -

Steve's counterclaim and Tasos's breach-of-fiduciary-duty claims in Counts 4 and 5) into a separate action.

The parties then spent another year and a half on various other motions, including motions for the award of attorney fees. In the end, the chancellor awarded Tasos approximately $533,000 and Steve and Paul each $90,000 in attorney fees from the trusts. All three brothers had requested a greater amount, but the chancellor declined to grant the full amount requested. The chancellor also ordered Steve and Paul to each reimburse $150,000 to the trusts ($300,000 total) that they had withdrawn to pay their own attorney fees and expenses during the litigation.[6] He denied Tasos's request that Steve and Paul be ordered to reimburse the trusts for an additional $600,000 in legal fees and expenses.

The chancellor entered the final order on December 12, 2023, setting a suspending bond of $1,000,000. Steve posted the required security, and Steve and Paul each filed timely notices of appeal.

ANALYSIS

Steve and Paul raise mostly overlapping assignments of error. Because the central question presented on appeal is whether the evidence supported the chancellor's finding that Steve and Paul's distribution plan was unfair to Tasos, we begin there.

*I. The chancellor did not abuse his discretion by rejecting Steve and Paul's plan as unfair.*

Trust B required that the assets be distributed in "equal shares, one for each child of [Anthony] then living." So did the IAG Trust. Steve and Paul claim that the chancellor erred in rejecting their proposed distribution plan, which they contend divided the assets fairly into equal shares.

_____

[6] While not explicitly mentioned in the order, the record indicates that $300,000 is what Steve and Paul withdrew from the trust to pay their legal fees between the May 2022 trial and the court's July 2022 order on the distribution plan.

- 15 -

Whether a distribution plan satisfies a trust document and the Code of Virginia presents "a mixed question of law and fact." *Keener v. Keener*, 278 Va. 435, 441 (2009). We review determinations of law de novo but defer to the trial court's findings of fact. *Id.* We will not reverse a trial court's "factual finding that an individual acted in bad faith unless the decision was plainly wrong or not supported by the evidence." *Rafalko*, 290 Va. at 398.

*A. As co-trustees, the brothers owed fiduciary duties to one another.*

Although they disagree about almost everything else, the brothers agree that as co-trustees, they owed fiduciary duties to one another in matters relating to trust administration and the distribution of trust assets. Under the Virginia Uniform Trust Code,[7] a trustee must "administer the trust solely in the interests of the beneficiaries." Code § 64.2-764(A). When, as here, "a trust has two or more beneficiaries, the trustee shall act impartially in investing, managing, and distributing the trust property, giving due regard to the beneficiaries' respective

---

[7] The Uniform Trust Code was approved by the Uniform Laws Commission (also known as the National Conference of Commissioners on Uniform State Laws) in 2000. *See* John E. Donaldson & Robert T. Danforth, *The Virginia Uniform Trust Code*, 40 U. Rich. L. Rev. 325, 329 (2005). Thirty-six states have since enacted it. *See* Uniform Law Commission, Trust Code, Enactment History (2024), https://perma.cc/8A23-ME4F. For the current version of the model code and the Commission comments, see Uniform Trust Code (Uniform Laws Comm'n 2023), https://perma.cc/Z7XS-JJTJ.

Virginia adopted the Uniform Trust Code in 2005, 2005 Va. Acts ch. 935 (codified as amended at Code §§ 55-541.01 to -551.06 (Supp. 2005)), though the provisions were subsequently relocated to Title 64.2, *see* 2012 Va. Acts ch. 614 (codified as amended at Code §§ 64.2-700 to -808). "In applying and construing this uniform act, consideration shall be given to the need to promote uniformity of the law with respect to its subject matter among states that enact it." Code § 64.2-805.

Before the Code's adoption, "the law of trusts in Virginia [was] . . . set forth in fragmentary statutory schemes and in scattered case law spread among reported decisions going back centuries." Donaldson, *supra*, at 327. The Virginia Uniform Trust Code now "set[s] forth the law of trusts in a single source, conveniently accessible to lawyers, fiduciaries, and others having the need to understand the law in this area." *Id.* The Code does not displace preexisting Virginia law governing trusts unless expressly modified. Code § 64.2-704; *see also Crosby v. ALG Tr., LLC*, 296 Va. 561, 576 n.2 (2018) (same).

- 16 -

interests." Code § 64.2-765; *see also* Code § 64.2-777(B) ("The exercise of a power is subject to the fiduciary duties prescribed by this article.").

When a trustee enters into a transaction involving trust property "for the trustee's own personal account or that is otherwise affected by a conflict between the trustee's fiduciary and personal interests," the transaction "is voidable by a beneficiary affected by the transaction unless" certain statutory exceptions are satisfied. Code § 64.2-764(B). For instance, a self-interested transaction may be permitted when "authorized by the terms of the trust" or when the beneficiary "consented to trustee's conduct" or "ratified the transaction." Code § 64.2-764(B)(1), (3). Such a transaction is also permitted if "approved by the court." Code § 64.2-764(B)(2). Steve and Paul sought the chancellor's blessing for the non-pro-rata-distribution plan that they advocated here.

### B. Steve and Paul's I-cut-I-choose strategy was fraught from the start.

The chancellor was understandably troubled that after Steve and Paul divided the assets into three buckets, they refused to let Tasos choose his preferred bucket but assigned him the one Steve had created for him. The chancellor's discomfort was supported by the procedural unfairness of Steve and Paul's *I-cut-I-choose* methodology.

*I-cut-I-choose* is a far cry from *I-cut-you-choose*. Anyone who grew up with siblings might have practiced the time-honored *I-cut-you-choose* method to fairly divide something everyone wanted, like a cake or a pizza. That method, also known as *divide and choose*, is "elegantly simple: one person (the cutter) would divide the disputed matter into two pieces and then allow the other (the chooser) to choose which piece she would take for herself." *Seokoh, Inc. v. Lard-PT, LLC*, No. 2020-0613-JRS, 2021 Del. Ch. LEXIS 62, at *1-2 (Mar. 30, 2021). "The incentives for fair partition are obvious: the cutter is incented to divide in equal pieces knowing she will be left with the piece the chooser leaves behind." *Id.* at *2.

- 17 -

*I-cut-you-choose* has ancient origins that resonate today. Abram and Lot used it to choose separate lands to occupy to avoid strife between their herdsmen, for the land "was not able to bear them" both; Abram proposed that Lot go to the left or the right, and Lot got to choose, opting to settle in the plain of Jordan. *Genesis* 13:1-12 (King James). The 1982 Convention on the Law of the Sea employs a divide-and-choose strategy to allocate seabed-mining claims to developed nations while protecting the interests of developing countries. *See* Steven J. Brams & Alan D. Taylor, *Fair Division: From cake-cutting to dispute resolution* 10 (1996) ("Brams & Taylor"). A robust scholarship surrounding *I-cut-you-choose* has blossomed across academic disciplines. In political philosophy, Professor Rawls offered it as an example of "pure procedural justice." John Rawls, *A Theory of Justice* 85 (1971). By having "one man divide the cake and get the last piece, the others being allowed their pick before him," the cutter "will divide the cake equally, since in this way he assures for himself the largest share possible." *Id.* Professors Brams and Taylor, in mathematics and political science, respectively, have helpfully surveyed the variations on *I-cut-you-choose* developed by scholars in the twentieth century, including methods to divide heterogenous goods fairly among multiple claimants. *See* Brams & Taylor, *supra*, at 30-50.

Perhaps not surprisingly, *none* of those methods resembles the *I-cut-I-choose* method that Steve and Paul insisted on here. Steve and Paul divided the assets into three buckets and asked the chancellor to make Tasos accept the bucket they assigned him. To state the obvious, *I-cut-I-choose* lacks procedural safeguards to restrain the cutter's temptation to self-deal and to ensure that the outcome is fair.

That their plan was inequitable can also be shown by its abject failure to achieve an "envy-free" allocation. *See* Brams & Taylor, *supra*, at 9. "An allocation is envy-free if every player thinks he or she receives a portion that is at least tied for largest, or tied for the most

- 18 -

valuable and, hence, does not envy any other player." *Id.* at 241. But Steve and Paul's plan engendered envy all around. Believing that Steve and Paul were cheating him, Tasos preferred to trade buckets with one of them; they refused, confirming his suspicion that they were giving themselves more. For his part, Steve rejected letting Tasos pick first for fear that Tasos would spot an asset that Steve had undervalued, which would make Steve want to "redo the buckets." The only workable, envy-free solution here was the pro-rata distribution that the chancellor ultimately ordered.

C. *The evidence supported the chancellor's substantive unfairness findings.*

Steve and Paul's plan was inequitable to Tasos not only because their *I-cut-I-choose* procedure was unfair. The chancellor also had ample basis to find that their plan was *substantively* unfair to Tasos and that, in pressing its adoption, Steve and Paul breached their "duty of loyalty, good faith and fairness."

1. *Steve and Paul unfairly devalued the ownership interests they assigned to themselves.*

To start, Steve and Paul significantly devalued their interests in the five income-producing properties they kept for themselves, using discounts ranging from 36% to 53.8%, thereby reducing the putative value of the assets on their side of the ledger by $1.6 to $1.7 million. Relying on Martin's testimony, they justified that move by claiming that a fair-market-value approach to valuing minority shares generally applies discounts for lack of marketability and lack of control. Relying on Dr. Waller's testimony, by contrast, Tasos argued that he was entitled to "fair value," without such discounts, because he was being forced to part with his interests involuntarily.

The parties agreed at oral argument here that the chancellor had discretion to choose the proper valuation method to assess the fairness of Steve and Paul's plan. *Accord Bosserman v. Bosserman*, 9 Va. App. 1, 8 n.1 (1989) ("There is no uniform rule for valuing stock in closely

held corporations. The valuation method must be tailored to meet the particular needs of each case."); Principles of Corporate Governance, Standard for Determining Fair Value § 7.22 cmt. e (Am. Law Inst. 2010) ("The standard of valuation employed in any given context should reflect the purpose served by law in that context . . . .").

In this case, the evidence supported the chancellor's decision to reject Steve and Paul's valuation, which was based on a fair-market-value method that applied significant minority and marketability discounts. As Dr. Waller explained, fair market value is premised on a hypothetical sale by a willing buyer and a willing seller who is not under compulsion to sell. Given that assumption, a minority discount may be appropriate because a minority interest offered for sale does not confer control over the entity, so the interest would command less value in an arm's length sale. Similarly, a share in a closely held entity is not as marketable as a share in a publicly traded company, thus warranting a marketability discount.

But those assumptions are out of place in a forced sale or forced redemption. Quite simply, Tasos did not want to give up his interests in the five income-producing properties that Steve and Paul wanted for themselves. Because Tasos was forced to give up his interests in those companies, the discounts resulted in what Dr. Waller described as a "windfall" to Steve and Paul.

Dr. Waller opined that the "fair value" approach without discounts "would be a more appropriate standard of value in this case." His opinion is well-supported in the academic literature and in persuasive precedents from other jurisdictions. As the Supreme Court of Delaware has held in the context of corporate-shareholder freezeouts, "to fail to accord to a minority shareholder the full proportionate value of his shares imposes a penalty for lack of control, and unfairly enriches the majority shareholders who may reap a windfall from the appraisal process by cashing out a dissenting shareholder, a clearly undesirable result." *Cavalier*

- 20 -

*Oil Corp. v. Harnett*, 564 A.2d 1137, 1145 (Del. 1989); *see also* 1 Corporate Acquisitions & Mergers § 5A.05[5][b] n.90 (2024) (collecting cases following Delaware's approach).

Similarly, Professor Moll has explained that "the 'voluntary sale' model contemplated by the fair market value approach is a poor fit in the [shareholder] oppression context. The oppressed minority investor was not looking to sell, and the oppressive majority investor, absent the threat of dissolution or other judicial sanction, was not looking to buy." Douglas K. Moll, *Shareholder Oppression and "Fair Value": Of Discounts, Dates, and Dastardly Deeds in the Close Corporation*, 54 Duke L.J. 293, 321 (2004). "Instead of a voluntary sale conception, it is more accurate to characterize an oppression buyout as a compelled redemption of the minority's ownership position." *Id.* at 322. "Because a buyout of the typical oppressed shareholder resembles a forced redemption far more than it resembles a voluntary sale, the fair market value standard should be rejected." *Id.* at 325. Thus, "[m]inority and marketability discounts are inappropriate in shareholder oppression disputes." *Id.* at 366.

Although there is a "paucity of direct guidance in the LLC setting," the same principles apply there as well. Sandra K. Miller, *Discounts and Buyouts in Minority Investor LLC Valuation Disputes Involving Oppression or Divorce*, 13 U. Pa. J. Bus. L. 607, 631 (2011). Professor Miller described the need to extend the rationale of cases like *Cavalier* to judicial buyouts of minority interests in LLCs. In that context too, "the purpose of a judicial buy-out . . . is not to closely simulate a market sale, but rather, to fashion a sensible remedy to compensate for a lost investment. A judicially ordered buy-out occasioned by oppressive conduct is not voluntary in any sense of the word." *Id.* at 632-33; *see also* Douglas K. Moll, *Minority Oppression & the Limited Liability Company: Learning (or Not) From Close Corporation History*, 40 Wake Forest L. Rev. 883, 976 (2005) ("Just as courts developed the oppression

doctrine to protect minority shareholders in close corporations, so too should courts extend the oppression doctrine to safeguard minority members in LLCs.").[8]

In short, Steve and Paul were unfairly discounting the value of the income-generating properties that they moved to their side of the ledger after deciding to exclude Tasos altogether from sharing in them. To ostensibly equalize the buckets, Steve and Paul then gave themselves more assets and cash. The record thus supports Dr. Waller's opinion that the discounts taken by Steve and Paul resulted in an "egregious" windfall to them at Tasos's expense.

Neither Steve nor Paul has assigned error to the chancellor's rejecting their valuations as lacking credibility. "It is well-settled that a party who challenges the ruling of a lower court

---

[8] Professor Miller has recommended that model-law organizations and States (like Virginia) that follow such model laws "consider harmonizing the valuation language among their partnership, corporate, and LLC statutes." Miller, *supra*, at 649. Harmonization would reduce confusion about valuation methods across different types of business organizations. *Id.* at 609-10.

For instance, "the Revised Uniform Limited Liability Company Act authorizes a judicial dissolution, but [it] is silent with regard to the possibility of a court-ordered purchase in lieu of a dissolution and thus, contains no guidance on valuation matters." *Id.* at 628. Virginia follows that model act. *See* Code § 13.1-1047 (governing judicial dissolution of LLCs without specifying the valuation method). The Model Business Corporation Act provides appraisal rights based on a "fair value" approach "without discounting for lack of marketability or minority status except, if appropriate, for amendment to the articles of incorporation." Model Business Corporation Act § 13.01 (ABA 2024) ("MBCA"). Virginia follows that model act as well. *See* Code § 13.1-729 (adopting same definition of "fair value"). The MBCA's drafters noted that such discounts "are inappropriate in most appraisal actions, both because most transactions that trigger appraisal rights affect the corporation as a whole and because such discounts may give the majority the opportunity to take advantage of minority shareholders who have been forced against their will to accept the appraisal-triggering transaction." MBCA § 13.01, cmt. 2(b); *cf.* Principles of Corporate Governance, *supra*, § 7.22(a) (stating that appraisal valuations should be "without any discount for minority status or, absent extraordinary circumstances, lack of marketability"). And the Revised Uniform Partnership Act treats a judicial buyout of a dissociated partner as that partner's share of the higher of the entity's liquidation value or its value as a going concern. Revised Uniform Partnership Act ("RUPA") § 701(b) (Uniform Laws Comm'n 1997) (last amended 2013). Virginia follows that provision too. *See* Code § 50-73.112(B). "The notion of a minority discount in determining the buyout price is negated by valuing the business as a going concern." RUPA § 701 cmt. b. *But see id.* ("Other discounts, such as for lack of marketability or the loss of a key partner, may be appropriate, however.").

must . . . assign error to each articulated basis for that ruling." *Manchester Oaks Homeowners Ass'n v. Batt*, 284 Va. 409, 421 (2012). An "appellant's 'failure to address one of the holdings results in a waiver of any claim of error with respect to the court's decision on that issue.'" *Johnson v. Commonwealth*, 45 Va. App. 113, 116 (2005) (quoting *United States v. Hatchett*, 245 F.3d 625, 644-45 (7th Cir. 2001)). Because the improper valuations alone suffice to affirm the chancellor's rejection of Steve and Paul's plan as unfair, Steve and Paul's failure to assign error to that finding provides an independent ground for affirming the chancellor's unfairness ruling.

### 2. *Steve and Paul unfairly assigned the entire debt to Tasos.*

The record also amply supports the chancellor's finding that Steve and Paul's distribution plan unfairly saddled Tasos with the entire Trust B debt—$901,427. Thompson, the parties' former lawyer, advised the brothers not to attempt a non-pro-rata distribution unless they all agreed. Martin—Steve and Paul's own expert—testified that debt carries risk and different people have different risk tolerances. Tasos strongly objected to being assigned the full amount of the debt. He did not want to assume the risk of default or incur the interest and tax liability associated with carrying the debt. He also viewed his brothers' move as a vindictive ploy to "stick him and his kids with a bunch of debt."

What is more, a lawyer who qualified as an expert in Virginia trust-and-estates practice, Andrew H. Hook, testified that in his 42 years' experience, he had never before seen a trustee try to impose a debt obligation involuntarily on a beneficiary like this. Hook said it was like trying to "give my credit card debt to [the] guy I like the least[.] I can't do that." The best practice in this situation, he explained, was for the trustee to "clean" up the estate debt before distributing the assets to the beneficiaries.

In the end, the chancellor acted well within his discretion to conclude that Steve and Paul unfairly assigned the entire debt to Tasos. And here again, Steve and Paul have not assigned

- 23 -

error to that ruling. Their failure to do so provides another independent basis to affirm the chancellor's unfairness finding. *Manchester Oaks*, 284 Va. at 421; *Johnson*, 45 Va. App. at 116.

> ### 3. The evidence showed that a non-pro-rata distribution contravened the settlors' intent.

The chancellor also found that Steve and Paul's proposed distribution plan was inconsistent with Anthony and Irene's intent to distribute assets to their sons as equal shares in each asset. In light of Steve and Paul's failure to assign error to it, that finding has great significance.

The Virginia Uniform Trust Code "has not altered the fundamental principles that in construing, enforcing and administrating wills and trusts, the testator's or settlor's intent prevails over the desires of the beneficiaries, and that intent is to be ascertained by the language the testator or settlor used in creating the will or trust." *Ladysmith Rescue Squad, Inc. v. Newlin*, 280 Va. 195, 201-02 (2010). In other words, "the intent of the grantor controls." *Harbour v. Suntrust Bank*, 278 Va. 514, 519 (2009). Likewise, "[t]he cardinal principle of will construction is that the intention of the testator controls." *Gillespie v. Davis*, 242 Va. 300, 303 (1991) (quoting *Clark v. Strother*, 238 Va. 533, 539 (1989)).[9]

"We initially ascertain the grantor's intent by reviewing the language that the grantor used in the trust instrument." *Harbour*, 278 Va. at 519. "If that language is clear and unambiguous, we will not resort to rules of construction . . . ." *Id.* "Extrinsic evidence may never be used in aid of the interpretation of a will if the language is clear and unambiguous." *Gillespie*, 242 Va. at 303. *See generally Worsham v. Worsham*, 74 Va. App. 151, 165-67 (2022) (discussing the parameters of the parol-evidence rule). On the other hand, if the language is

---

[9] There is "no material difference" in the rules of interpretation for trusts and wills. *Stace v. Bumgardner*, 89 Va. 418, 421 (1892); *see, e.g.*, *Harbour*, 278 Va. at 519 (citing a will case, *Huaman v. Aquino*, 272 Va. 170, 174 (2006), for the rules for interpreting a trust agreement).

ambiguous, a court may consider "so-called 'facts and circumstances' evidence." *Gillespie*, 242 Va. at 304 (quoting *Coffman v. Coffman*, 131 Va. 456, 461 (1921)). That means "evidence about the testator, the testator's family and property; the claimants under the will and their relationship to the testator; the testator's hopes and fears; the testator's habits of thought and language; and similar matters." *Id.*; *see also Jones v. Meeks*, 153 Va. 449, 453 (1929) ("Accompanying facts and circumstances are always admissible in a case of disputed interpretation.").

The chancellor did not explicitly rule that the trust agreements here were ambiguous, but he implicitly found that they were. Both Trust B and the IAG Trust provided for the distribution of "equal shares" to Steve, Tasos, and Paul. In allowing Steve and Paul to propose a non-pro-rata distribution, the chancellor noted that "equal shares" could mean three non-pro-rata shares that were essentially equal in value.

Yet the evidence at trial persuaded the chancellor that, by "equal shares," the parents meant a pro-rata distribution of equal shares *in each asset*. The parents consistently gave all three sons equal shares in property, except for once when Paul had to wait until he was an adult to receive his equal share. When one of the sons argued for a larger share to reward what he perceived to be his greater personal effort, the parents refused. The chancellor found it "clear . . . that the parents of these three sons had a history of distributing equal interest or shares *in each particular asset* during their lifetimes." (Emphasis added.) He concluded that "the *estate documents themselves continue their wishes* in this regard by providing for equal share distributions." (Emphasis added.)

As neither Steve nor Paul assigns error to that finding, it too independently supports the chancellor's rejection of their non-pro-rata-distribution plan as inconsistent with the settlors' intent. *See Manchester Oaks*, 284 Va. at 421; *Johnson*, 45 Va. App. at 116.

*D. Steve and Paul's counterarguments lack merit.*

Steve and Paul raise various points to impeach the chancellor's rejection of their distribution plan as unfair to Tasos, but none has merit.

    *1. Steve and Paul did not have "conclusive" authority to impose their plan on Tasos.*

To start, Steve and Paul invoke the text of the trust documents, alongside Code § 64.2-105(B)(10), to argue that the chancellor should have rejected Tasos's challenge to their distribution plan. They insist that their approval as majority trustees was "conclusive." To be sure, the Code permits a "will or trust instrument" to imbue the trustee with various powers, including the power "[t]o make distributions in cash or in kind or partly in each *at valuations to be determined by the fiduciary*, whose decision as to values shall be *conclusive*." Code § 64.2-105(B)(10) (emphases added). Trust B included that language. And Steve and Paul claim that the IAG Trust incorporated that same language by referencing the predecessor statute.

Still, the Virginia Uniform Trust Code makes clear that such "absolute" language in a trust instrument does not empower trustees to approve a distribution plan in violation of their fiduciary duties to the beneficiaries:

> Notwithstanding the breadth of discretion granted to a trustee in the terms of the trust, including the use of such terms as "absolute," "sole," or "uncontrolled," the trustee shall exercise a discretionary power *in good faith and in accordance with the terms and purposes of the trust and the interests of the beneficiaries*.

Code § 64.2-776(A) (emphasis added). Thus, barring several exceptions not applicable here, the terms of a trust do not prevail over "the duty of a trustee to act in good faith and in accordance

with the terms and purposes of the trust and the interests of the beneficiaries." Code § 64.2-703(B)(2).[10]

In other words, "notwithstanding a broad grant of discretion" to the trustee, the "court is vested with the authority to evaluate whether the trustee's actions were consistent with the terms and purposes of the trust and in the best interests of the beneficiaries, and if they were not, to overrule the decision of the trustee as arbitrary and an abuse of discretion." *Rafalko*, 290 Va. at 397. *Accord* Uniform Trust Code § 814 cmt., at 143 (Uniform Laws Comm'n 2023), https://perma.cc/Z7XS-JJTJ ("Despite the breadth of discretion purportedly granted by the wording of a trust, no grant of discretion to a trustee, whether with respect to management or distribution, is ever absolute.").[11] So we reject Steve and Paul's suggestion that their distribution plan cannot be questioned, no matter how unfair it may be to Tasos.

        *2. Steve and Paul properly bore the burden to prove that their plan was fair.*

Steve and Paul also argue that we must throw out the chancellor's findings because he misassigned the burden of proof. They object to having the burden to prove that their plan was fair to Tasos. Because Tasos sued them first, they say, Tasos should have the burden to prove that their plan is unfair. Determining which party bears the burden of proof is a question of law that we review de novo. *Ballagh v. Fauber Enters.*, 290 Va. 120, 124 (2015).

Because Steve and Paul were acting as co-trustees in pressing a non-pro-rata distribution in which they were financially self-interested, they bore the burden of proving its fairness. For

---

[10] *See also* Code §§ 64.2-763, 64.2-764(A), 64.2-765, 64.2-777(B) (all imposing fiduciary duties on the trustee). *See generally* Donaldson, *supra*, at 335 ("[U]nder the Virginia UTC a settlor cannot relieve the trustee from the duty to act in good faith—to do so would be inconsistent with establishing a fiduciary relationship between the trustee and the beneficiaries.").

[11] The official comments to the Uniform Trust Code were approved by the Uniform Laws Commission and "are inordinately helpful in understanding the UTC." Donaldson, *supra*, at 332.

"when transactions have occurred between fiduciaries and those to whom they stand in such relation, the burden of proof lies upon the persons who fill the position of trust and confidence to show that the transaction has been fair." *Giannotti v. Hamway*, 239 Va. 14, 24 (1990). Or as the Court put it nearly a century ago, "[t]he burden of proof lies, in all cases, upon the party who fills the position of active confidence to show that the transaction has been fair." *Waddy v. Grimes*, 154 Va. 615, 648 (1930). This longstanding principle continues to apply under the Virginia Uniform Trust Code when scrutinizing the conduct of conflicted fiduciaries. *See* Code § 64.2-704 ("The common law of trusts and principles of equity supplement this chapter, except to the extent modified by this chapter or another statute of the Commonwealth."); *see also Crosby v. ALG Tr., LLC*, 296 Va. 561, 576 n.2 (2018) ("The Uniform Trust Code expressly supplements, rather than supplants, the common law of trusts.").

### 3. The chancellor did not impose a "greatly heightened burden of proof."

We also reject Steve and Paul's claim that the chancellor imposed an excessive burden on them to prove the plan's fairness. They rely on a stray remark at the beginning of the chancellor's bench ruling concluding the three-day trial on the plan's fairness. When recounting how the parties got there, he said that he had given Steve and Paul the opportunity to show that their proposed non-pro-rata-distribution plan resulted in equal shares, was fair to Tasos, and complied with the trust documents. Then he added: "And I think I even said it one time, although it's not an artful word, they have to come up with something and kind of sell it to Tasos, make it so that he couldn't say no to it."

Steve and Paul jump to the conclusion from that admittedly inartful remark that the chancellor somehow stacked the decks to give Tasos veto power over whatever plan they came up with, thereby requiring unanimity, not fairness. We are not persuaded.

- 28 -

"It is axiomatic that an appellate court must avoid 'fix[ing] upon isolated statements of the trial judge taken out of the full context in which they were made[] and us[ing] them as a predicate for holding the law has been misapplied.'" *Cellucci v. Commonwealth*, 77 Va. App. 36, 51 (2023) (en banc) (alterations in original) (quoting *Coward v. Wellmont Health Sys.*, 295 Va. 351, 363 n.11 (2018)). Having studied the record, we find no indication that the chancellor found Steve and Paul's plan unfair simply because Tasos opposed it. In other parts of the record, the chancellor made clear that Tasos did not have veto power. For example, the chancellor advised that "[i]f Tasos . . . said no to something that was so obviously a good plan, . . . the Court would act under the guise of the majority of trustees. I think a certain deference is due them." The chancellor likewise said, "if someone is being unreasonable at some point, the Court has no hesitation in saying this is an acceptable plan, that the objection is just unreasonable. If Tasos is being unreasonable, then the Court will rule for the brothers." On balance, the record reveals a chancellor who was committed to a fair division of assets and who applied the correct standard of proof.

### 4. The chancellor did not rule that Steve and Paul breached their fiduciary duties by "merely proposing" a non-pro-rata plan.

Steve argues that the chancellor found that he and Paul violated their fiduciary duties by "merely proposing" a non-pro-rata plan. Paul does not join in that argument.

Steve's argument is meritless. Far from penalizing Steve and Paul merely for proposing a non-pro-rata plan, the chancellor conducted a three-day trial to evaluate its fairness. After the evidence was submitted, however, the chancellor concluded *both* that Steve and Paul's plan was unfair to Tasos *and* that it flouted the parents' intent that their sons receive equal shares in each asset. Steve points to nothing in the record to show that he and Paul were penalized for simply proposing a non-pro-rata distribution.

*5. Steve and Paul cannot claim surprise that the chancellor found that their plan fell short of their fiduciary obligations to Tasos.*

Steve and Paul claim surprise at the chancellor's finding in his July 2022 order that the plan they proposed did not meet "the duty of loyalty, good faith and fairness required of trustees" and "f[e]ll short of required fiduciary conduct." They say they understood from their colloquy with the chancellor at the beginning of the May 2022 trial that Tasos's breach-of-fiduciary-duty claims would be severed for separate resolution. The July 2022 order then did so, severing various claims, including Tasos's breach-of-fiduciary-duty claims in Counts 4 and 5 of his second amended complaint. Steve and Paul complain that they did not get a chance at trial to show that they satisfied their fiduciary obligations in devising the plan.

But Steve and Paul conflate Tasos's breach-of-fiduciary-duty claims in Counts 4 and 5—which the chancellor severed—with whether the distribution plan they proposed was fair to Tasos. Tasos alleged in Count 4 of his second amended complaint that Steve and Paul breached their duty of loyalty by replacing the managers of Arcadia II, Argos, and Argos II with entities that Steve and Paul controlled, as well as by excluding Tasos from the management of the LLCs. Count 5 alleged that Steve and Paul violated their duty of impartiality by entering into conflicted transactions, reimbursing themselves from the trusts, refusing to provide information to Tasos, and using their positions of majority control to Tasos's detriment. Steve and Paul could not reasonably think that by severing *those* claims, the chancellor was excusing them from showing that the asset-distribution plan they advocated was fair and met their duties as fiduciaries.

Not only that, the record shows that Steve and Paul firmly grasped that the main purpose of the three-day trial was to let them show that their plan was fair to Tasos, thereby satisfying their fiduciary duties to him. When scheduling the hearing, the chancellor said that the purpose was to determine whether the plan would be "fair to all beneficiaries." At trial, Steve testified that his "primary objective . . . was to follow the trust documents and Virginia law, . . . to create

- 30 -

equal shares[,] and to . . . adher[e] to my fiduciary obligations as a trustee." Paul echoed Steve, claiming that their plan satisfied "all of our obligations as a fiduciary, being fair, impartial, loyal." Steve and Paul's lawyers likewise maintained that the plan satisfied their client's fiduciary obligations as trustees.[12]

Because Steve and Paul insisted at trial that their plan was fair to Tasos and satisfied their fiduciary obligations, they cannot claim surprise that the trial court addressed that very question.

*E. The chancellor did not have to give Steve and Paul another chance.*

Paul argues that the chancellor erred by not giving him and Steve another chance to devise a non-pro-rata-distribution plan that might be approved as fair to Tasos. Steve does not ask for leave to try again. Whether Steve and Paul should have been given another chance was a decision committed to the chancellor's sound discretion. *E.g.*, *Cangiano v. LSH Bldg. Co.*, 271 Va. 171, 179 (2006).

We find no abuse of discretion in the chancellor's ordering a pro-rata distribution and not giving Steve and Paul another shot to come up with a non-pro-rata plan. Anthony died in 2006, and Irene died in 2016. Yet the trust assets have still not been distributed to the brothers, due principally to their inability to get along and to Steve and Paul's insistence on a non-pro-rata distribution. The acrimonious dispute here calls to mind Lavater's wisdom: "Say not you know another entirely, till you have divided an inheritance with him." Johann Casper Lavater, *Aphorisms on Man* 157 (1788) (Scholars' Facsimiles and Reprints 1980).

The chancellor warned the parties when scheduling the fairness hearing, "[t]his estate must be concluded. It's gone on too long. It hasn't helped the harmony between the brothers at

---

[12] For instance, Steve's counsel told the chancellor that the evidence would show "how the plan complies with the trustee's duties of good faith and the terms of the trust." Paul's counsel agreed, insisting that the plan "fulfills their duties to distribute the assets in a fair, equal, and impartial manner."

all." The record below exceeds 17,000 pages. The brothers expended more than a million dollars in litigation expenses that would have been saved had a pro-rata distribution been ordered sooner. And after allowing significant resources to be expended from the trusts for Steve and Paul to prepare their non-pro-rata plan, the chancellor found that the plan they came up with was unfair to Tasos. Paul offers nothing to warrant optimism that he and Steve could do any better the next time. The chancellor reasonably concluded that enough was enough. *See* Code § 64.2-767 ("In administering a trust, the trustee may incur only costs that are reasonable in relation to the trust property, the purposes of the trust, and the skills of the trustee.").

Not only that, the chancellor found that the parents in their lifetimes conferred equal shares "in each particular asset" and that "the estate documents themselves continue their wishes in this regard by providing for equal share distributions." Paul's failure to contest that finding forecloses his request to try again to come up with a non-pro-rata distribution. All in all, the chancellor did not abuse his discretion by ordering a pro-rata distribution that would end this particular feud.

## II. *The chancellor's attorney-fee rulings were not an abuse of discretion.*

All the parties are unhappy about the chancellor's allocation of attorney fees.[13] Steve and Paul insist that they should recover all their attorney fees and costs because they acted in their capacity as trustees to resist Tasos's lawsuit and to propose a distribution plan that he opposed. They likewise object to the chancellor's making them refund a total of $300,000 of the trust funds spent on this litigation. For his part, Tasos complains that he had to spend $758,433 in attorney fees and costs defending against Steve and Paul's efforts to impose a non-pro-rata distribution, but he was awarded only $533,345. Tasos asks that we order the chancellor to

---

[13] Though the parties refer throughout their briefs to the possessive form "attorney's fees," the more modern usage employed in the Code and the Rules of the Supreme Court is *attorney fees. See Worsham*, 74 Va. App. at 178 n.9. We follow that usage here.

award him the full amount and that we require Steve and Paul to reimburse the trusts for Tasos's share of the trust funds that they were allowed to spend on this litigation after June 2021.[14]

Whether to award attorney fees is a question committed to the chancellor's sound discretion and is reviewable on appeal only for an abuse of discretion. *Galiotos I*, 300 Va. at 12. But whether attorney fees are recoverable under the statutory provisions at issue presents a question of law that we review de novo. *Reineck v. Lemen*, 292 Va. 710, 721-22 (2016).

Six provisions of the Uniform Trust Code ("UTC") are involved here.

First, Code § 64.2-762 (UTC § 709), governing "Reimbursement of expenses," entitles a trustee "to be reimbursed out of the trust property . . . for . . . [e]xpenses that were properly incurred in the administration of the trust." Code § 64.2-762(A)(1). "Reimbursement under this section may include attorney[] fees and expenses incurred by the trustee in defending an action. However, a trustee is not ordinarily entitled to attorney[] fees and expenses if it is determined that the trustee breached the trust." Uniform Trust Code, *supra*, § 709 cmt., at 123; *accord Stepp v. Foster*, 259 Va. 210, 216-17 (2000) (holding that the trustees' attorney fees and expenses were properly charged to the trust when the beneficiaries did not dispute the chancellor's finding that the trustees "had not breached their fiduciary duties").

Second, Code § 64.2-767 (UTC § 805), governing "Costs of administration," provides that, "[i]n administering a trust, the trustee may incur only costs that are reasonable in relation to the trust property, the purposes of the trust, and the skills of the trustee." "The obligation to

---

[14] Steve and Paul argue in their respective reply briefs that Tasos forfeited his attorney-fee claims because he failed to serve his cross-error designations on opposing counsel when filing them with the Court. *See* Rules 1:12 & 5A:25(d). Neither Steve nor Paul has articulated any prejudice from that omission. Still, our rejection of Tasos's attorney-fee claims on the merits makes it unnecessary to determine whether an appellee forfeits his cross-error by failing to serve such designations under Rule 5A:25(d).

incur only necessary or appropriate costs of administration has long been part of the law of trusts." Uniform Trust Code, *supra*, § 805 cmt., at 133.

Third, Code § 64.2-773 (UTC § 811), governing "Enforcement and defense of claims," requires a trustee to "take reasonable steps to enforce claims of the trust and to defend claims against the trust."

Fourth, Code § 64.2-792 (UTC § 1001), governing "Remedies for breach of trust," empowers a trial court to "[c]ompel the trustee to redress a breach of trust by paying money, restoring property, or other means" (subsection (B)(3)), or to "[o]rder any other appropriate relief" (subsection (B)(10)). Any "violation by a trustee of a duty the trustee owes to a beneficiary is a breach of trust." Code § 64.2-792(A).

Fifth, Code § 64.2-793 (UTC § 1002), governing "Damages for breach of trust," makes a trustee "who commits a breach of trust . . . liable to the beneficiaries affected for . . . [t]he amount required to restore the value of the trust property and trust distributions to what they would have been had the breach not occurred."[15] Code § 64.2-793(A)(1). In other words, the beneficiaries may "hold the trustee liable for the amount necessary to compensate fully for the consequences of the breach." Uniform Trust Code, *supra*, § 1002 cmt., at 160.

And finally, Code § 64.2-795 (UTC § 1004), governing "Attorney fees and costs," provides broad equitable power for the circuit court to award attorney fees to "any party":

> In a judicial proceeding involving the administration of a trust, the court, *as justice and equity may require*, may award costs and expenses, *including reasonable attorney fees*, to any party, *to be paid by another party or from the trust* that is the subject of the controversy.

---

[15] The trustee is personally liable "for the greater of" such damages or "[t]he profit the trustee made by reason of the breach." Code § 64.2-793(A)(1)-(2).

- 34 -

Code § 64.2-795 (emphases added). That provision broadens the common-law rule. "Generally, litigation expenses were at common law chargeable against another party only in the case of egregious conduct such as bad faith or fraud." Uniform Trust Code, *supra*, § 1004 cmt., at 162. Under this provision, however, a court may not only "award a party its own fees and costs from the trust," but it may "also charge a party's costs and fees against another party to the litigation." *Id.* A court may also "award a beneficiary litigation costs if the litigation is deemed beneficial to the trust." *Id.* Indeed, as in this case, "[s]ometimes, litigation brought by a beneficiary involves an allegation that the trustee has committed a breach of trust." *Id.*

Given the broad equitable powers conferred on the chancellor by these provisions, the parties have not shown any abuse of discretion in the chancellor's partial fee-shifting rulings. As discussed above, the trust documents themselves were ambiguous about whether the settlors intended that "equal shares" could be effectuated by a non-pro-rata division that was equal in value. The chancellor afforded each party funds from the trusts to evaluate the non-pro-rata plan that Steve and Paul developed. Although it was reasonable to do that under the circumstances known to the chancellor at the time, the three-day trial that followed showed that the plan that Steve and Paul developed treated Tasos unfairly. Their plan did not satisfy their "duty of loyalty, good faith and fairness." Not only that, the evidence showed that when the parents said in the trust documents that they wanted the trust assets to be distributed in "equal shares," they meant equal shares "in each particular asset."

Because Tasos proved that his brothers' plan (1) was unfair and pressed in breach of their fiduciary duties, and (2) contrary to the settlors' intent, the chancellor acted well within his discretion to order that Steve and Paul partially restore the trust funds they spent in litigation. The chancellor also acted within his discretion to largely but not completely reimburse Tasos, both for his success as a co-trustee in effectuating the settlors' intent, as well as in his capacity as

a beneficiary for the losses he suffered when his brothers pressed an unfair plan in violation of their fiduciary obligations.

We reject Steve and Paul's argument that they are insulated from a personal attorney-fee award under Code § 64.2-795 by our Supreme Court's 2016 decision in *Reineck*, 292 Va. at 710. For one thing, Steve and Paul ignore the other fee-shifting provisions that apply here. For another, *Reineck* is easily distinguished. *Reineck* held that when a party litigates only in a representative capacity, not a personal capacity, that party cannot be held personally liable under Code § 64.2-795 for the opposing party's attorney fees. *Id.* at 721-23. The Court reasoned that the statute permits a fee award only "against a 'party.'" *Id.* at 723 (quoting Code § 64.2-795). In *Reineck*, "[t]he party to the suit was Reineck as curator, not Reineck personally." *Id.* Here, however, Steve and Paul are parties in *both* their personal and representative capacities. So it was proper under Code § 64.2-795 for the chancellor to impose an attorney-fee award against them personally.

Finally, we decline Tasos's request for additional reimbursement from the trusts. Tasos has failed to show how the chancellor abused his discretion by awarding him most of what he sought. The chancellor explained that some of Tasos's motions were not granted, so "no fees [were] due" for that work. As Tasos has failed to identify the fees and expenses for which he was not reimbursed but should have been, we cannot say that the chancellor abused his discretion when he awarded Tasos most (but not all) of what he asked for.

CONCLUSION

In sum, we find no basis to disturb the chancellor's determinations.

*Affirmed.*

- 36 -